**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**ELIZABETH A. BELLIN**
Elkhart, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JOSE G. ALEJANDRO, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 20A03-1306-CR-224 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ELKHART CIRCUIT COURT
The Honorable Terry C. Shewmaker, Judge
Cause No. 20C01-1207-FA-36

**February 17, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Jose G. Alejandro appeals his conviction and sentence for attempted murder. Alejandro raises two issues, which we revise and restate as:

I.      Whether the evidence is sufficient to sustain his conviction; and

II.     Whether his sentence is inappropriate in light of the nature of the offense and his character.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In May 2012, Alejandro was a member of the Latin Kings. Dennis Patino was a member of Society's Most Wanted ("SMW"). SMW "did not get along with Latin Kings." Transcript at 368. Alejandro and Patino knew each other before Patino joined SMW, and the two were Facebook friends. Flavio Contreras was not a member of the Latin Kings or SMW but would hang out with Patino and others who were a part of SMW.

At some point,[1] Alejandro, posting on Facebook as King Love, commented on Patino's Facebook wall stating "yo whats up my nigga." State's Exhibit at 15. Treyas Mitchell, a SMW member, posted the comment "damn [Patino] let me find out we talk to chaps/kings now thought it was kk nk wey."[2] Id. Patino then posted the comment "[a]ll day errday SMW till I pass away." Id. Patino intended to communicate to Mitchell that he was "not a punk" and that he was "really part of" SMW. Transcript at 370. Alejandro then posted the comment "i see nigga." State's Exhibit 15.

---

[1] State's Exhibit 15 is a copy of Patino's Facebook wall. According to State's Exhibit 15, the comments discussed above were posted between "Wednesday at 1:44 p.m." and "Wednesday at 2:18 p.m."

[2] A "Chap" is a Northsider, a "King" is a Latin King, a "kk" is a "King killer," an "nk" is a Northside killer, and "wey" is "[s]lang, like, hey, friend." Transcript at 367-369. Patino indicated that Mitchell's comment was a show of disrespect to the Northside group as well as to the Latin Kings.

On May 23, 2012, Contreras, who was nineteen years old at the time, spent most of the day with Patino and some other friends at Studebaker Park in Elkhart, Indiana. Patino used to live across the street from Contreras and had known him since he was twelve or thirteen years old. After leaving Studebaker Park, Contreras went home, ate dinner, and watched television with his family.

At approximately 11:00 p.m., Alejandro knocked on the door of Contreras's home, and Contreras answered the door and spoke with him. Alejandro asked Contreras for Patino's location, and Contreras told him that he did not know. Alejandro told Contreras to step outside and talk to him, but Contreras refused because he noticed that Alejandro was holding something behind his back and there was no reason for Alejandro to be there. Contreras was concerned for his safety. Alejandro told Contreras to go with him and show him Patino's location, but Contreras refused. Alejandro then told him: "well you got to come on or I'm going to pop you right here." Transcript at 454. Contreras understood that Alejandro meant that he would shoot him if he did not go. Contreras stepped inside for his sweater and shoes, and Alejandro, with his hand behind his back, followed Contreras inside. Contreras appeared nervous, and Alejandro told Contreras's mother that he would bring Contreras back in thirty minutes and that they were "not going to do stupid things." Id. at 406. Alejandro also said that Contreras was misbehaving. Contreras and Alejandro then exited the house.

Contreras and Alejandro walked across the street, and Alejandro told Contreras to enter the car. Contreras entered the backseat and sat next to Eric Alicorn, a Latin King, and Alejandro entered the backseat after Contreras. Contreras was seated between Alejandro on his left and Alicorn on his right, and Alejandro removed his hand, which

3

was holding a gun, from behind his back. Two other men were seated in the vehicle's front seat.

The vehicle pulled away and traveled on County Road 6 and later on a portion of County Road 19 which was very dark, deserted, without many houses, and with farmland on one side and trees on the other side. While they were driving, Alejandro repeatedly asked Contreras for Patino's location and where Patino lived, and Contreras continued to refuse to tell him. Contreras attempted to explain to Alejandro that he was not "going to give it up" and that "if he was my friend somebody would have came asking for him I wouldn't have gave him up, you know what I mean." Id. at 464.

The driver then began to stop the vehicle and as it came to a stop, Alejandro passed the gun to Alicorn and said: "well, I guess we going to have to do it." Id. at 465. Alejandro and Alicorn exited the vehicle, and, while Contreras was still in the backseat, Alicorn shot Contreras four times. The bullets hit Contreras in the neck, hand, elbow, and back of his head. Someone pulled Contreras from the backseat of the vehicle, and, as he was being dragged out of the vehicle, Alicorn fired a fifth shot which struck Contreras in his abdomen. Contreras fell to the ground with his face toward the back tire of the vehicle. The men then "stomped on [Contreras] a little bit" while he was on the ground, stating "kick this mother f-----." Id. at 468-469. Alejandro, Alicorn, and the two others entered the vehicle and drove away, leaving Contreras on County Road 19.

After midnight, Contreras's mother had her daughter call people who could know Alejandro, eventually obtained his phone number, and called him and asked about Contreras. He told her that Contreras was not with him, that he was with Patino, and that he "was doing bad things." Id. at 411. Contreras's mother told him to bring Contreras

4

home, and she was upset because Alejandro did not answer her questions. Contreras was unable to walk and had severe back pain.

On County Road 19, a driver was startled to see Contreras, who was on the right side of the road, waving his arm, and the driver swerved to avoid hitting him. The driver drove home, called 911, and returned with her husband and waited for police and an ambulance to arrive.

Contreras was taken by ambulance to the hospital. He had no pulse on his right arm, a gunshot entry wound in the back of his head with an exit wound behind his right ear, a graze wound from a bullet to the right side of his neck, a gunshot wound to the back of one of his hands and a finger, and a gunshot entry wound on the right flank area of his abdomen and an exit wound on the left flank area of his abdomen. He sustained injury to his brachial artery requiring surgery, and the bullet that passed through his abdomen injured his liver, spleen, and both kidneys. His right kidney "was kind of shattered within his abdomen." Id. at 284.

On July 9, 2012, the State charged Alejandro with attempted murder as a class A felony and filed a sentencing enhancement for association with a criminal gang. A jury found Alejandro guilty of attempted murder as charged and found that the State proved the criminal gang enhancement beyond a reasonable doubt.

At sentencing, the court found Alejandro's age, statement of remorse, statements of Alejandro's counsel, and the fact that Alejandro was not the person who shot Contreras to be mitigating circumstances. The court found the following facts as aggravating: that Alejandro was an undocumented person, he first used marijuana at age nine, he illegally used alcohol and was under the influence of both alcohol and marijuana

5

at the time of the offense, his criminal history consisted of five juvenile cases and one misdemeanor, he could have called off the offense at any time, he involved other persons in the criminal act and left Contreras without seeking medical help, he provided false information to Contreras's mother, his acts were clearly gang related, the victim will require long-term medical care, and other sanctions against Alejandro have not been effective. The court determined that any one of the aggravators taken individually or all of them as a whole outweigh the mitigators warranting the imposition of a substantially aggravated sentence, and sentenced Alejandro to fifty years for attempted murder enhanced by fifty years for the criminal gang enhancement for an aggregate sentence of one hundred years.

## DISCUSSION

### I.

The first issue is whether the evidence is sufficient to sustain Alejandro's conviction for attempted murder. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. Jordan v. State, 656 N.E.2d 816, 817 (Ind. 1995), reh'g denied. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. Id. We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. Id. The uncorroborated testimony of one witness, even if it is the victim, is sufficient to sustain a conviction. Ferrell v. State, 565 N.E.2d 1070, 1072-1073 (Ind. 1991).

The offense of attempted murder is governed by Ind. Code § 35-42-1-1 and Ind. Code § 35-41-5-1. To convict a defendant of attempted murder, the State must prove

beyond a reasonable doubt that the defendant, acting with the specific intent to kill, engaged in conduct which constitutes a substantial step toward the commission of murder. Mitchem v. State, 685 N.E.2d 671, 676 (Ind. 1997). A "substantial step" toward the commission of a crime, for purposes of the crime of attempt, is any overt act beyond mere preparation and in furtherance of intent to commit an offense. Hughes v. State, 600 N.E.2d 130, 131 (Ind. Ct. App. 1992). Whether a defendant has taken a substantial step toward the commission of the crime is a question of fact to be decided by the trier of fact based on the particular circumstances of the case. Id. "[W]hen determining whether the defendant has taken a substantial step toward a crime, the focus is on what has been completed, not on what remains to be done." Hughes v. State, 600 N.E.2d 130, 132 (Ind. Ct. App. 1992).

Ind. Code § 35-41-2-4 provides that "[a] person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense. . . ." "Under accomplice liability, an accomplice is criminally responsible for all acts committed by a confederate which are a probable and natural consequence of their concerted action." McGee v. State, 699 N.E.2d 264, 265 (Ind. 1998) (citation and internal quotation marks omitted). It is not necessary that a defendant participate in every element of a crime to be convicted of that crime under a theory of accomplice liability. Bruno v. State, 774 N.E.2d 880, 882 (Ind. 2002), reh'g denied. In determining whether there was sufficient evidence for purposes of accomplice liability, we consider such factors as: (1) presence at the scene of the crime; (2) companionship with another at the scene of the crime; (3) failure to oppose commission of the crime; and (4) course of conduct before, during, and after occurrence of the crime. Id. A defendant's mere

7

presence at the crime scene, or lack of opposition to a crime, standing alone, is insufficient to establish accomplice liability. Tobar v. State, 740 N.E.2d 109, 112 (Ind. 2000). These factors, however, may be considered in conjunction with a defendant's course of conduct before, during, and after the crime, and a defendant's companionship with the one who commits the crime. Id. Furthermore, accomplice liability applies to the contemplated offense and all acts that are a probable and natural consequence of the concerted action. Wieland v. State, 736 N.E.2d 1198, 1202 (Ind. 2000).

Alejandro asserts that the evidence is insufficient to demonstrate that he, as an accomplice, had the specific intent to kill Contreras, that his role was to merely assist Alicorn by handing him a weapon, that the evidence showed he had an issue with Patino and not Contreras, and that Contreras was not affiliated with the Latin Kings or SMW.

The State maintains that sufficient evidence was presented to prove that Alejandro intended that Alicorn kill Contreras, that he willfully participated with Alicorn and the others before, during, and after the shooting, and that he lured Contreras out of his house with a gun, threatened to shoot Contreras if he did not give up his friend, revealed the gun to Contreras while driving as a constant reminder of what would happen if Contreras did not cooperate, and that "when it became clear that [Contreras] was not going to reveal his friend's location, [Alejandro] handed his gun to [Alicorn] and said 'well, I guess *we* going to have to do it.'" Appellee's Brief at 10 (citing Transcript at 465). The State also notes that Alejandro had opportunities to intervene but did not do so, left Contreras on the road to die, fled with the others, and tried to conceal the crime by lying to Contreras's mother.

8

We look to the evidence and the reasonable inferences therefrom that support the verdict. See Jordan, 656 N.E.2d at 817. Alejandro's argument is an invitation to reweigh the evidence, which we cannot do. Id. We also note that the Indiana Supreme Court has "unequivocally determined that the requisite intent to kill may be inferred from the use of a deadly weapon in a manner likely to cause death or great bodily harm." Maxwell v. State, 731 N.E.2d 459, 462 (Ind. Ct. App. 2000) (citations omitted), trans. denied. Alejandro handed the gun to Alicorn, and Alicorn's action of firing shots into Contreras's head and abdomen "undoubtedly constitutes using a deadly weapon in a manner likely to cause death." See Cook v. State, 675 N.E.2d 687, 692 (Ind. 1996). Further, accomplice liability applies to the contemplated offense and all acts that are a probable and natural consequence of the concerted action. Wieland, 736 N.E.2d at 1202.

Based upon the evidence favorable to the conviction, including Alejandro's conduct before, during, and after the shooting, and the other factors set forth in Bruno regarding accomplice liability, we conclude that the State presented evidence of probative value from which a reasonable jury could have determined beyond a reasonable doubt that Alejandro was guilty based on accomplice liability of attempted murder. See Wieland, 736 N.E.2d at 1203 (holding in part that a reasonable trier of fact could have determined beyond a reasonable doubt that the defendant was guilty based on accomplice liability of felony murder and noting that the defendant accompanied the shooter to the store, knowing that the shooter was armed, did nothing to oppose the commission of any of the crimes, and did not withdraw from the enterprise).

The next issue is whether Alejandro's sentence is inappropriate. Indiana Appellate Rule 7(B) provides that this court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

Alejandro argues that, while he participated in giving Alicorn the gun, he was not the person who ultimately shot Contreras and thus that his culpability was diminished significantly. He asserts that his criminal history is relatively limited, he has a fifth grade education, is twenty-one years of age, was under the influence of drugs and alcohol at the time of the offense, and that he is not one of the worst of the worst to justify a maximum sentence.

The State contends that Alejandro's sentence is appropriate in light of the heinous nature of his offense, and his character, pointing to Alejandro's extended criminal history, gang affiliation, and the fact that he was under the influence of alcohol and marijuana when he committed the offense.

Our review of the nature of the offense reveals that, when he took offense to a comment made on Facebook by Patino and armed with a gun, Alejandro attempted to force Contreras to show him where Patino lived or was located, and that, when Contreras would not do so, handed the gun to Alicorn and stated, "well, I guess we going to have to do it." Transcript at 465. After Alicorn shot Contreras five times and the men kicked Contreras on the ground, Alejandro and the others drove away and Alejandro told

Contreras's mother that Contreras was with Patino. Contreras sustained gunshot wounds in the back of his head, to the right side of his neck, to the back of one of his hands and a finger, and to his abdomen. Contreras sustained serious injuries to his brachial artery, liver, spleen, and both kidneys. In his victim impact statement, Contreras stated that he lost his job, his mom lost her babysitting job because the children's parents did not feel safe, he cannot sleep at night, his family experienced much trauma, and that he incurred significant financial obligations for his medical treatment.

Our review of Alejandro's character shows that he was twenty years old at the time of the offense, his criminal history includes juvenile delinquent adjudications for visiting a common nuisance, illegal consumption of an alcoholic beverage, two counts of resisting law enforcement, being a runaway, a curfew violation, and public intoxication. As an adult, he was convicted of possession of marijuana as a class A misdemeanor. The PSI further indicates that Alejandro completed the fifth grade, he was a member of a gang, he reported marijuana use beginning at age nine, and that on the day of the instant offense he was under the influence of alcohol and other drugs. At the sentencing hearing, Alejandro stated that "growing up being young, [he] never had a parent to lead [him] the right way so [he] decided to take it on [his] own hands and live that way because [he] ain't had nobody else to guide [him] the right way." Transcript at 748. The PSI states that Alejandro reported that he has had no relationship with his father, but that his mother is "a good lady" and she does not abuse alcohol or other drugs and does not have a criminal record. Appellant's Appendix at 128.

11

After due consideration, we conclude that Alejandro has not sustained his burden of establishing that his sentence is inappropriate in light of the nature of the offense and his character.[3]

For the foregoing reasons, we affirm Alejandro's conviction and sentence for attempted murder.

Affirmed.

ROBB, J., and BARNES, J., concur.

---

[3] To the extent Alejandro argues that the trial court abused its discretion in considering the fact that he was a member of a gang as an aggravating circumstance because that fact was an element of his enhancement, we note that the court identified ten other aggravating circumstances and found that any one individually or taken as a whole outweigh the mitigating circumstances and warrant the imposition of a substantially aggravated sentence. In light of this, we can say with confidence that the trial court would have imposed the same sentence had it considered only the remaining aggravating circumstances. See Drakulich v. State, 877 N.E.2d 525, 535 (Ind. Ct. App. 2007) (holding that we could say with confidence that the trial court would have imposed the same sentence if it considered only the proper aggravators), trans. denied.